State, Plaintiff, vs. Rufus, Defendant.

*May 15—June 12, 1931.*

318

*G. Arthur Johnson,* district attorney of Ashland county, the *Attorney General,* and *J. E. Messerschmidt,* assistant attorney general, for the plaintiff.

*Wm. J. Kershaw* of Milwaukee, for the defendant.

NELSON, J. The question reported inquires as to the jurisdiction of a state court to entertain a prosecution of an Indian having tribal relations and residing on a reservation, for the crime of statutory rape committed within the limits of a reservation, upon an Indian having tribal relations and residing upon a reservation. This question is an important one, not only to the state of Wisconsin but also to all tribal Indians still residing upon Indian reservations located within this state.

As early as 1879 this court, in *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439, which was a case of first impression in this court and involving substantially this same question, held that, when not restricted by existing treaties with Indian tribes, or by an act admitting a state into the Union, and not restricted by the authority of Congress under the federal constitution to "regulate commerce with the Indian tribes," the jurisdiction of a state extended to all members of such tribes within the territorial limits of the state; that the criminal laws of this state applied to the Indians on their reservations, and that the circuit court had jurisdiction of all violations of the criminal laws, whether by Indians or others, committed upon Indian reservations. In this case an Indian was prosecuted in the circuit court for Brown county for the crime of adultery with a white woman, committed upon the Oneida Indian reservation. Doxtater, the Indian, was convicted, as was also the woman. *State v. Harris,* 47 Wis. 298, 2 N. W. 543.

It is manifest that if the opinion of the court in *State v. Doxtater* is sound, then the answer to the question reported should be ruled by that case and would require little effort to answer.

The opinion in the *Doxtater Case* is based upon several propositions of law which, in the light of later controlling decisions of the United States supreme court, must be considered unsound. The court held that "after the passage of the act of Congress of 1834, upon the formation of any state out of the country designated in that act as the Indian country, and its admission into the Union on equal terms with the original states, the jurisdiction of the United States to punish for crimes committed upon the Indian reservations within such state would be lost, unless reserved by the act admitting such state into the Union," and that "the power to punish crimes after that, upon the reservations within the state, must be either vested in the state or remain with the tribes themselves;" that "the jurisdiction of the state, when not restricted by existing treaties made with the tribes, or by the act admitting the state into the Union, is supreme over the subject, and extends to all persons and places within the state," and that "the criminal laws of this state were intended to apply to the Indians living upon the reservations therein."

The following quotations taken from the opinion of Mr. Justice Taylor in *State v. Doxtater* are illustrative of the views of the court entertained at that time, in the light of the then existing laws and decisions (p. 291):

"Unless the jurisdiction of the state over the territory occupied by the Indians within its boundaries is prohibited by the act admitting the state into the Union, or by some existing treaty with the Indians occupying such territory at the time of its admission, there does not seem to be any authority in Congress to pass laws for the government or control of such Indians, or to prohibit the states from passing such laws, except the provision of the constitution which authorizes Congress to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. Under this provision of the constitution, Congress has passed laws regulating trade with the Indians, requiring the taking out of licenses for that purpose, prohibiting the

selling of intoxicating liquors to them, and other things which come within the power to regulate commerce; but it never has been contended that under this provision Congress had the power to pass laws generally for the punishment of crimes committed on these reservations, either by the Indians or by other persons."

This court, after a consideration of the then existing authorities, entertained no doubt that the criminal laws of this state applied to the Indians on their reservations within this state.

A reading of the opinion by Mr. Justice TAYLOR reveals that the conclusions arrived at were the result of an extended study and consideration of the then existing decisions of both the federal and state courts. That great confusion existed among the decisions relating to Indians prior to the enactment by Congress of the law of 1885, hereinafter specifically set forth, is perfectly apparent when the numerous and varied decisions dealing with the Indians are considered. The confusing history of state and federal legislation and judicial decisions upon matters affecting the relations of our governments to the Indians was pointed out in *People ex rel. Cusick v. Daly,* 212 N. Y. 183, 105 N. E. 1048. In that case, at page 196, it was said:

"The Indians, although native sons of our soil, are not citizens either of the nation or state. They are heralded as the wards of the nation, and in their collective or tribal capacity they have been relegated to the status of foreign nations with whom the federal government has entered into treaty relations. This anomaly has been accentuated by the state legislation and treaties which, from time to time and in various ways, have indicated the purpose of the state to subject the Indians within our borders to the control of our laws and the jurisdiction of our courts."

In view of the fact that *State v. Doxtater* was decided before Congress enacted the law of March 3, 1885, now sec. 328 of the Criminal Code of the United States, and be-

fore the many decisions hereinafter cited were handed down by the United States supreme court and by the numerous state courts, it is not at all to be wondered at that the views expressed by this court in 1879 are not sound, when considered in connection with the overwhelming current of authority establishing the law during the past fifty years.

It is apparent from what has already been said, that any doubt as to how the reported question should be answered arises out of the question as to whether the state or the United States has jurisdiction of crimes committed by Indians upon Indian reservations. It is quite obvious that the question before us is a federal question and that, no matter what our former holdings may have been, we are constrained to follow the rules laid down by the supreme court of the United States, if rules applicable to a determination of this controversy have been clearly established. As was said in *Yohyowan v. Luce,* 291 Fed. 425, 429, "but in any event, both this court and the supreme court of the state of Washington are bound by the decision of the supreme court of the United States; the question involved being one arising under the laws of the United States and capable of being determined by that court finally, whether . . . the question originates in a state or in a federal court."

Has this question been determined by the supreme court of the United States in a manner adverse to the holding of this court in the *Doxtater Case?*

Prior to the year 1885 the only statutes defining the jurisdiction of the United States courts as to crimes committed by Indians in Indian country (with the exception of a very limited number of crimes specifically applicable to Indians) were secs. 2145 and 2146 of the Revised Statutes of the United States, which are as follows:

"Sec. 2145. (General laws as to punishment of crimes extended to Indian country.) Except as to crimes the pun-

ishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

"Sec. 2146. (Exceptions to the operation of the preceding sections.) The preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to any ·Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

Sec. 2145 was first enacted in the year 1834 and sec. 2146 in the year 1854. It will be noted that sec. 2146 specifically provides that sec. 2145 "shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian." In the cases that arose prior to 1885 it was held that as to crimes committed by Indians upon Indians and in Indian country, or Indian reservations, the United States had no authority to prosecute such actions.

Most notable of such cases is *Ex parte Crow Dog,* 109 U. S. 556, 3 Sup. Ct. 396, decided in 1883, in which it was held that sec. 2146 of the Revised Statutes excepted from the general jurisdiction of the courts of the United States offenses committed in Indian country by one Indian against the person or property of another Indian. In that particular case an Indian was prosecuted for the murder of another Indian, which murder was committed in "Indian country." Speaking of the extent to which Indians were subject to the criminal laws of the United States, the court said (p. 568) :

"They were nevertheless to be subject to the laws of the United States, not in the sense of citizens, but, as they had always been, as wards subject to a guardian; not as individuals, constituted members of the political community of the United States, with a voice in the selection of representatives

and the framing of the laws, but as a dependent community who were in a state of pupilage, advancing from the condition of a savage tribe to that of a people who, through the discipline of labor and by education, it was hoped might become a self-supporting and self-governed society. The laws to which they were declared to be subject were the laws then existing, and which applied to them as Indians, and, of course, included the very statute under consideration, which excepted from the operation of the general laws of the United States, otherwise applicable, the very case of the prisoner."

Again, speaking of the exception found in sec. 2146, the court said (pp. 571–72):

"It is a case where, against an express exception in the law itself, that law, by argument and inference only, is sought to be extended over aliens and strangers; over the members of a community separated by race, by tradition, by the instincts of a free though savage life, from the authority and power which seeks to impose upon them the restraints of an external and unknown code, and to subject them to the responsibilities of civil conduct, according to rules and penalties of which they could have no previous warning; which judges them by a standard made by others and not for them, which takes no account of the conditions which should except them from its exactions, and makes no allowance for their inability to understand it. It tries them, not by their peers, nor by the customs of their people, nor the law of their land, but by superiors of a different race, according to the law of a social state of which they have an imperfect conception, and which is opposed to the traditions of their history, to the habits of their lives, to the strongest prejudices of their savage nature; one which measures the red man's revenge by the maxims of the white man's morality. It is a case, too, of first impression so far as we are advised, for, if the question has been mooted heretofore in any courts of the United States, the jurisdiction has never before been practically asserted as in the present instance. The provisions now contained in secs. 2145 and 2146 of the Revised Statutes were first enacted in sec. 25 of the Indian Intercourse Act of 1834 (4 Stats. 733). Prior to that, by the

act of 1796 (1 Stats. 479), and the act of 1802 (2 Stats. 139), offenses committed by Indians against white persons and by white persons against Indians were specifically enumerated and defined, and those by Indians against each other were left to be dealt with by each tribe for itself, according to its local customs. The policy of the government in that respect has been uniform."

In that case it was held that the United States district court was without jurisdiction to try the defendant and that his conviction and sentence were void and his imprisonment illegal.

The decision in *Ex parte Crow Dog, supra,* no doubt moved Congress to enact sec. 328 of the Criminal Code, which became a law on March 3, 1885.

Sec. 328, with the exception of the proviso and several slight amendments, is substantially the same as when enacted in 1885 and is as follows:

"Sec. 328. (Indians committing certain crimes; how punished.) All Indians committing against the person or property of another Indian or other person any of the following crimes, namely—murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, burglary, and larceny, within any Territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such Territory relating to said crimes, and shall be tried therefor in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases. And all such Indians committing any of the above-named crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States: *Provided,* that

any Indian who shall commit the offense of rape upon any female Indian within the limits of any Indian reservation shall be imprisoned at the discretion of the court."

The enactment of this law, which gave jurisdiction to the courts of the United States to entertain prosecutions brought against Indians for murder and the other crimes described therein, marked a new departure of the government of the United States in dealing with the Indians. The constitutionality of this law was attacked in *U. S. v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109. This case was decided in 1885 after sec. 328 was enacted. The court, in a vigorous opinion, construed this section and upheld both the power of Congress to enact it and its constitutionality. Speaking of the second distinct definition of the conditions under which Indians may be punished for certain crimes, defined by the common law, committed by one Indian against the person or property of another Indian, the court said (p. 377):

"The second, which applies solely to offenses by Indians which are committed within the limits of a state and the limits of a reservation, subjects the offenders to the laws of the United States passed for the government of places under the exclusive jurisdiction of those laws, and to trial by the courts of the United States."

This is a still further advance, as asserting this jurisdiction over the Indians within the limits of the states of the Union. As to the power of Congress to enact such a law the court said (p. 383):

"The statute itself contains no express limitation upon the powers of a state or the jurisdiction of its courts. If there be any limitation in either of these, it grows out of the implication arising from the fact that Congress has defined a crime committed within the state, and made it punishable in the courts of the United States. But Congress *has* done this, and *can* do it, with regard to all offenses relating to matters to which the federal authority extends. Does that

authority extend to this case? It will be seen at once that the nature of the offense (murder) is one which in almost all cases of its commission is punishable by the laws of the states, and within the jurisdiction of their courts. The distinction is claimed to be that the offense under the statute is committed by an Indian, that it is committed on a reservation set apart within the state for residence of the tribe of Indians by the United States, and the fair inference is that the offending Indian shall belong to that or some other tribe. It does not interfere with the process of the state courts within the reservation, nor with the operation of state laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation."

It is obvious that the law laid down in this case cannot be harmonized with the holding of this court in *State v. Doxtater*. In *U. S. v. Pelican*, 232 U. S. 442, 34 Sup. Ct. 396, it was held that the United States retains jurisdiction over Indian lands and the Indians living thereon even though the lands have been allotted to the Indians in severalty but not fully patented to them. Speaking of lands allotted to Indians but not fully patented to them, the court said (p. 447):

"Although the lands were allotted in severalty, they were to be held in trust by the United States for twenty-five years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable. That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians, is not open to controversy. *U. S. v. Rickert*, 188 U. S. 432, 437, 23 Sup. Ct. 478; *McKay v. Kalyton*, 204 U. S. 458, 466, 468, 27 Sup. Ct. 346; *Couture v. U. S.* 207 U. S. 581, 28 Sup. Ct. 259; *U. S. v. Celestine*, 215 U. S. 278, 290, 291, 30 Sup. Ct. 93; *U. S. v. Sutton*, 215 U. S. 291, 30 Sup. Ct. 116; *Tiger v. Western Inv. Co.* 221 U. S. 286, 315, 316, 31 Sup. Ct. 578; *Hallowell v. U. S.* 221 U. S. 317, 31 Sup. Ct. 587; *U. S. v. Wright*, 229 U. S. 226, 237, 33 Sup. Ct. 630."

Jurisdiction over the Indians and the Indian lands has always been claimed on the ground that the Indians are the wards of the nation, in a condition of pupilage or dependency, and have not been discharged from that condition. The supreme court of the United States has consistently based its decisions on this theory. *Worcester v. Georgia,* 6 Pet. (31 U. S.) 515; *Ex parte Crow Dog,* 109 U. S. 556, 3 Sup. Ct. 396; *U. S. v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109; *U. S. v. Nice,* 241 U. S. 591, 36 Sup. Ct. 696, wherein it is said, quoting from *U. S. v. Kagama, supra* (p. 597):

" 'These Indian tribes are the wards of the nation. They are communities dependent on the United States. . . . From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power.' "

The court further added (p. 598):

"Of course, when the Indians are prepared to exercise the privileges and bear the burdens of one *sui juris,* the tribal relation may be dissolved and the national guardianship brought to an end, but it rests with Congress to determine when and how this shall be done, and whether the emancipation shall at first be complete or only partial. Citizenship is not incompatible with tribal existence or continued guardianship, and so may be conferred without completely emancipating the Indians or placing them beyond the reach of congressional regulations adopted for their protection."

These cases apparently dispose of the doctrine asserted in *State v. Doxtater* that "unless the jurisdiction of the state over territory occupied by the Indians within its boundaries is prohibited by the act admitting the state into the Union, or by some existing treaty with the Indians occupying such territory at the time of its admission, there does not seem to be any authority in Congress to pass laws for the government or control of such Indians." In *U. S. v. Pelican, supra,* it was specifically held that the authority of Congress to deal

with crimes committed by or against Indians upon lands within a reservation is not affected by the admission of a territory within which a reservation is included, as a state into the Union.

Since the forceful declaration by the supreme court of the United States as to the powers and authority of Congress to deal with the Indians with respect to their crimes, and especially those enumerated in sec. 328, made in *U. S. v. Kagama, supra,* there has been little disposition on the part of state courts to question the exclusive jurisdiction of the courts of the United States as to the eight major crimes specified in sec. 328, as will appear from the cases hereinafter considered.

Following the coming down of the decision in *U. S. v. Kagama,* the state courts have, almost without exception, yielded to the logic of that decision and subsequent decisions of the supreme court of the United States, and have uniformly held that, as to the eight crimes mentioned, the state courts are without jurisdiction. In *Ex parte Cross,* 20 Neb. 417, 30 N. W. 428 (1886), it was held, in a case involving horse stealing by an Indian from an Indian and on an Indian reservation (following *U. S. v. Kagama*), that the state courts have no authority to prosecute and punish an Indian for a crime committed against another Indian on a reservation to which they each belonged so long as they maintained their tribal relations. Our own court, in *Stacy v. La Belle,* 99 Wis. 520, 75 N. W. 60 (1898), recognized the effect of sec. 328 in these words (p. 523) :

"The exclusive jurisdiction of the federal courts was further extended to certain other crimes committed by Indians by the act of March 3, 1885 (23 U. S. Stats. at Large, 385, ch. 341, sec. 9). For a construction of these statutes, see *In re Wilson,* 140 U. S. 575, 11 Sup. Ct. 870; *In re Mayfield,* 141 U. S. 107, 11 Sup. Ct. 939; *Smith v. U. S.* 151 U. S. 50, 14 Sup. Ct. 234; *Westmoreland v. U. S.* 155 U. S.

545, 15 Sup. Ct. 243. In speaking of the statute as it stood before the act of 1885, Mr. Justice MILLER said: 'It does not interfere with the process of state courts within the reservation, nor with the operation of state laws upon white people found there. Its effect is confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation.' *U. S. v. Kagama,* 118 U. S. 383, 6 Sup. Ct. 1109."

The court, however, added (p. 524):

"It has frequently been held that, except in so far as the jurisdiction of the state courts has been restricted by federal legislation or treaty, they may take jurisdiction even of crimes committed by Indians. *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439; *State v. Harris,* 47 Wis. 298, 2 N. W. 543; *People v. Ketchum,* 73 Cal. 635, 15 Pac. 353."

This case was a civil action brought by a licensed Indian trader to recover for goods sold and delivered to an Indian. The jurisdiction of the court to entertain such an action was the sole question involved in that appeal. *State v. Howard,* 33 Wash. 250, 74 Pac. 382 (1903), involved the murder of an Indian by an Indian upon an Indian reservation. In that case the jurisdiction of the state court was upheld on the ground that, although the defendant was in fact an Indian, it did not appear that he had maintained tribal relations with any Indian tribe and the prosecution was therefore not controlled by the act of 1885, the court saying (p. 259):

"We do not believe it was the intention of Congress that an Indian without tribal relations, who resides among the white people of a state and is amenable to the laws thereof, can go within an Indian reservation in that state and commit a crime against another Indian, and then assert that the courts of his state cannot try him for the crime."

Whether this doctrine is sound admits of grave doubts in view of the holding in *U. S. v. Pelican, supra,* which involved the murder of an Indian by white men on lands allotted but not fully patented to the former, wherein it was

said (p. 451) : "The deceased must be regarded as one who was still under the government's care. Congress had not terminated that relation, and the commission of a crime against his person upon Indian lands, such as we have found the allotted lands in question to be, was punishable under the laws of the United States."

In *State v. Columbia George,* 39 Oreg. 127, 65 Pac. 604 (1901), where the defendants, both Indians and allottees, were prosecuted for the murder of an Indian on a reservation, it was held that the federal courts have jurisdiction of murder committed by an Indian against another Indian, upon an Indian reservation, although within state boundaries, to the exclusion of the state courts, and that (p. 147) "the state courts have never had jurisdiction over the Indians within the Indian country or upon Indian reservations, except as and in so far as the general government has relinquished the supervisory control and authority over them."

In *Ex parte Van Moore,* 221 Fed. 954, 971, the conviction in a state court of a tribal Indian for the murder of an Indian committed on a reservation was involved. It was held "that the state court was without jurisdiction to hold any hearing or make any determination in the premises, and that the order of the state court directing the petitioner's imprisonment was and is void."

In *Yohyowan v. Luce,* 291 Fed. 425, an Indian who had been convicted in a state court of the crime of manslaughter and sentenced to the state penitentiary for a crime committed upon an Indian woman and within an Indian reservation, was discharged in a *habeas corpus* proceeding in which the court held (p. 428) "that exclusive jurisdiction of the crime of which the petitioner herein was convicted is vested in the federal courts."

In *People ex rel. Cusick v. Daly,* 212 N. Y. 183, 105 N. E. 1048 (1914), an Indian who lived with other members of his tribe on a reservation was charged in justice

court with the crime of assault with intent to kill another Indian. It was held (p. 197) :

"The Congress has exercised its power in respect of the crimes enumerated in sec. 328 of the United States Criminal Code, and the crime for which the relator has been arrested and held is among those therein set forth. For these reasons we think that the jurisdiction of our state courts must give way before the higher authority which this statute vests in the federal courts."

The foregoing authorities overwhelmingly establish the rule that as to the eight crimes mentioned in sec. 328, the courts of the United States have exclusive jurisdiction. But the crime of statutory rape, of which the defendant has been convicted, is not one of the eight crimes mentioned in sec. 328, it being clear that the crime of rape mentioned in sec. 328 was intended to apply to the common-law crime of rape and not to the lesser offense described in sec. 279 of the United States Criminal Code, "Having carnal knowledge of a female under sixteen," etc. It will be noted that sec. 278 of the Criminal Code provides that whoever shall commit the crime of rape shall suffer death, but that sec. 328 provides that "any Indian who shall commit the offense of rape upon any female Indian within the limits of any Indian reservation shall be imprisoned at the discretion of the court." The crime charged not being one of the eight enumerated in sec. 328, the question is as to whether the state courts or the United States courts have jurisdiction to try Indians for lesser crimes and misdemeanors not mentioned in sec. 328, and as to whether Indians who still maintain their tribal relations and who reside on reservations as the wards of the United States, can be prosecuted at all, in either the courts of the state or of the United States, for such lesser offenses. Following the decision in *U. S. v. Kagama,* the supreme court of Minnesota in *State v. Campbell,* 53 Minn. 354, 359, 55 N. W. 553 (1893), a prosecution for

adultery committed by a tribal Indian who lived on a reservation under the charge of a government agent and received government annuities from the United States, with a half-breed woman who was not connected with any tribe but resided with her husband, a white man, until shortly before the commission of the crime, held that Indians maintaining their tribal relations are the wards of the general government and under its protection, and necessarily are the subjects of federal authority, over which Congress has the same power to legislate within the states as over any other subject of federal jurisdiction. As to the effect and intent of Congress in enacting sec. 328 the court said:

"And if they are thus under the control of Congress, that control must be exclusive, for, as suggested in the case of the *Kansas Indians,* 5 Wall. 737, 'from necessity there· can be no divided authority.' It would never do to have both the United States and the state legislating on the same subject. By the act of 1885, presumably, Congress has enumerated all the acts which in their judgment ought to be made crimes when committed by Indians, in view of their imperfect civilization. For the state to be allowed to supplement this by making every act a crime on their part which would be such if committed by a member of our more highly civilized society would be not only inappropriate, but also practically to arrogate the guardianship· over these Indians which is exclusively vested in the general government."

The following comment on *State v. Doxtater* may be of interest (53 Minn. 354, at p. 359, 55 N. W. 553, 555):

"The exception among the decisions of the state courts on the subject to which we have heretofore alluded is the very exhaustive and able opinion in *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439. But with all due deference to that eminent court, it seems to us that they have not given due weight to the fact that the jurisdiction of the federal government over these Indian tribes rests, not upon the ownership of and sovereignty over the country in which they reside, but upon the fact that, as the wards of the general government, they are the subjects of federal authority within the states as

well as within the territories—a doctrine which the supreme court of the United States has developed and announced in the case of *U. S. v. Kagama, supra,* much more distinctly than in any deliverance extant when *State v. Doxtater* was under consideration, some fourteen years ago."

*In re Blackbird,* 109 Fed. 139, involved a prosecution brought by the state of Wisconsin against an Indian, a member of the Chippewa tribe who resided on the Bad River reservation. The defendant therein was charged with setting a net on said reservation contrary to a Wisconsin statute which prohibited such netting. The defendant was convicted by the state court. The question before the federal court was "whether the fish and game laws of Wisconsin extend to the arrest and punishment of Indians maintaining their tribal relations and residing upon Indian reservations within the limits of the state." Speaking of the controversy involved the court said (p. 140):

"It is, in short, the continuation of a controversy which should properly have ended with the decision of the United States supreme court in *U. S. v. Kagama,* 118 U. S. 375, 6 Sup. Ct. 1109, 30 Lawy. Ed. 228. Before that time there may have been some excuse for such decisions as that of the supreme court of Wisconsin in *State v. Doxtater,* 47 Wis. 278, 2 N. W. 439, where it was held that the criminal laws of this state apply to the Indians on their reservations within the state, and that the state circuit courts have jurisdiction of all crimes committed within the borders of the county of Brown, where the reservation was situated. That decision was made in 1878, before the law of Congress providing a code of criminal law for Indians so situated was passed."

Commenting on *State v. Campbell, supra,* the court said (p. 142) that the true doctrine was therein stated, and added:

"In that case, as in the *Case of Doxtater, supra,* decided by the supreme court of Wisconsin, the crime of which the state assumed to have jurisdiction over the Indians was that of adultery, which the United States statute above quoted

gives no jurisdiction to punish. This was also the case *Ex parte Mayfield*, 141 U. S. 107, 11 Sup. Ct. 939, 35 Lawy. Ed. 635, where the supreme court held that a member of the Cherokee nation committing adultery with an unmarried woman within the limits of its territory is amenable only to the courts of the Indian nation."

In *In re Lincoln*, 129 Fed. 247, it was held that an Indian could not be prosecuted in a court of the state of California for having in his possession deer meat contrary to the provisions of the penal code of the state of California because "the justice court was without jurisdiction" to enter the judgment under which the imprisonment of the prisoner is sought to be justified. In *State v. Big Sheep*, 75 Mont. 219, 243 Pac. 1067 (1926), the supreme court of that state, in a very able and exhaustive opinion by Mr. Chief Justice CALLOWAY, held that if the defendant therein was an Indian and a member of the Crow tribe, and if the offense of unlawfully possessing "peyote" was committed on a reservation, the defendant was not amenable to a law of the state of Montana which made the possession of "peyote" unlawful, and could not be subjected to punishment by a state court, citing *State v. Campbell, supra,* and other decisions herebefore cited. It will be noted that this decision involved an offense not committed by the defendant against another Indian, nor against the laws of the United States, but only against the laws of the state of Montana.

Any doubt which might exist as to the true doctrine to be applied to crimes committed by Indians upon Indian reservations, or as to the policy of the government of the United States, as reflected in acts of Congress and Indian administration for many years, seems clearly dispelled by *U. S. v. Quiver*, 241 U. S. 602, 36 Sup. Ct. 699, decided in 1916. In that case the defendant was prosecuted for adultery in a United States court. Speaking of sec. 2146, U. S. Rev. Stat., and especially of the exception therein

contained, in the light of the act of 1885 and in answer to the contention that adultery was not an offense within the exception because not committed by one Indian against the person or property of another Indian, the court said (p. 605):

"Is it not obvious that the words of the exception are used in a sense which is more consonant with reason? And are they not intended to be in accord with the policy reflected by the legislation of Congress and its administration for many years, that the relations of the Indians among themselves—the conduct of one toward another—is to be controlled by the customs and laws of the tribe, save when Congress expressly or clearly directs otherwise? In our opinion this is the true view. The other would subject them not only to the statute relating to adultery, but also to many others which it seems most reasonable to believe were not intended by Congress to be applied to them. One of these prohibits marriage between persons related within and not including the fourth degree of consanguinity computed according to the rules of the civil law and affixes a punishment of not more than fifteen years' imprisonment for each violator. To justify a court in holding that these laws are to be applied to Indians there should be some clear provision to that effect. Certainly that is not so now. Besides, the enumeration in the acts of 1885 and 1903, now secs. 328 and 329 of the Penal Code, of certain offenses as applicable to Indians in the reservations carries with it some implication of a purpose to exclude others."

The only decision emanating from a state court, and decided since *U. S. v. Kagama,* which seems to be out of harmony with the well established law is *Kitto v. State,* 98 Neb. 164, 152 N. W. 380 (1915). In that case an allottee Indian was charged in a state court with an assault upon another who was a like allottee Indian on an allotment of another Indian. While recognizing the force and effect of the act of March 3, 1885, the court held that the allottees involved in that case were citizens of the United States and of the state of Nebraska by virtue of certain statutes therein con-

sidered and were no longer subject to the exclusive jurisdiction of the United States as regards the commission of crimes on allotted lands, saying (p. 171) :

"The defendant and other allottees of his tribe within the state of Nebraska are given the full protection of its laws. They are citizens of the state. They are electors. They are entitled to hold office. They are competent to serve on juries, thereby participating in the enforcement of the laws, both civil and criminal, of the state. They have accepted allotments of land and with it citizenship. They have adopted the habits of civilized life. They are residing upon their allotments, to all intents and purposes separate and apart from any tribe. They are no longer bound by the laws or customs of their tribe. Congress has not reserved to the federal courts the jurisdiction to punish for misdemeanors. If such jurisdiction is not vested in the state courts, it is not vested anywhere, and the perpetrators of misdemeanors of all kinds on an Indian reservation may go unpunished. Such, clearly, was not the intention of Congress. It is not to be found within any of its enactments. It is against public policy, and contrary to the laws of this state, which extend to all, both Indians and white men, within or without the limits of a reservation, the equal protection of the law."

The case of *U. S. v. Pelican, supra,* which seems to hold quite the contrary as to allottee Indians, although decided about a year prior to the decision in *Kitto v. State,* was not mentioned in the opinion and apparently not considered. The assertion that "Congress has not reserved to the federal courts the jurisdiction to punish for misdemeanors and that, if such jurisdiction is not vested in the state courts, it is not vested anywhere, and that perpetrators of misdemeanors of all kinds on Indian reservations may go unpunished," is obviously contrary to the overwhelming authority in this country and fails to give consideration to the intention of Congress to leave the punishment of crimes not mentioned in the act of 1885, or in other enactments peculiarly made applicable to Indians, to the tribes themselves.

The Yale Law Journal, vol. XXXIX, p. 307, contains an illuminating paper by Professor Ray A. Brown of the Wisconsin Law School, entitled "The Indian Problem and the Law," which has been of material assistance to the court in determining the true and correct answer to the question reported. The conclusion reached by this court is in complete accord with the views expressed by Professor Brown.

We conclude, after a careful consideration of the decisions rendered since 1885, that *State v. Doxtater* is completely out of harmony with the decisions of the courts, both state and federal, and that it should no longer continue as an authority which may be invoked in an attempt to justify prosecutions brought in the courts of this state against Indians who are still wards of the nation, for crimes committed on Indian reservations. While prosecutions brought in the state courts against Indians might have beneficial results, such is not sufficient to confer jurisdiction upon state courts in the absence of legislation by Congress authorizing such jurisdiction.

*By the Court.*—The question reported for answer by this court must be answered "No."